# In the United States Court of Federal Claims

No. 12-728C
(Filed February 15, 2013)

| | |
|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* Post-award bid protest; 28 |
| | \* U.S.C. § 1491(b)(1) (2006); |
| **RED RIVER COMMUNICATIONS,** | \* permanent injunctive relief; |
| **INC.,** | \* whether waiver rule under <u>Blue</u> |
| Plaintiff, | \* <u>& Gold Fleet, L.P. v. United</u> |
| | \* <u>States</u>, 492 F.3d 1308 (Fed. Cir. |
| v. | \* 2007), applies to non-bidder or |
| | \* offeror; protest bar on task |
| **THE UNITED STATES,** | \* orders pursuant to the Federal |
| | \* Acquisition Streamlining Act, |
| Defendant. | \* 10 U.S.C. § 2034c(e) (Supp. V |
| | \* 2011). |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* |

<u>Johnathan M. Bailey</u>, San Antonio, TX, for plaintiff.

<u>Sharon A. Snyder</u>, Washington, DC, with whom was <u>Principal Deputy Assistant Attorney General Stuart F. Delery</u>, for defendant. <u>Marvin K. Gibbs</u>, Joint Base Andrews Air Force, Camp Springs, MD, of counsel.

### MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This case is before the court after argument and supplemental briefing on cross-motions for judgment on the administrative record. The key issues for decision are whether a non-offeror is subject to the rule that a challenge to a patent error in a solicitation is waived unless it is brought to the contracting officer's attention prior to the deadline for submission of proposals, <u>see</u> <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308 (Fed. Cir. 2007), and whether the protestor has advanced an authorized challenge to the scope of a task order pursuant to the Federal Acquisition Streamlining Act, 10 U.S.C. § 2304c(e) (Supp. V 2011).

### FACTS

Plaintiff Red River Communications, Inc. ("plaintiff"), provided Base Telecommunications System ("BTS") services at Tinker Air Force Base ("Tinker") from June 2002 through September 2012. Compl. filed Oct. 26, 2012, ¶¶ 4-5; Pl.'s Br. filed Dec.

11, 2012, at 8; Def.'s Br. filed Dec. 31, 2012, at 13.  Previously, the United States Air Force (the "Air Force") had obtained those services through two small business set-aside procurements for which plaintiff was the successful offeror.  Compl. ¶ 5.  On June 8, 2012, the Air Force issued Solicitation No. FA8101-12-R-0037 (the "Solicitation") for BTS services to be provided at Tinker from September 9, 2012, to September 30, 2012, with two one-year option periods thereafter, from October 1, 2012, to September 30, 2013, and October 1, 2013, to September 30, 2014.  AR 25, 71-255.  Unlike the two previous contracts awarded to plaintiff, the Solicitation was issued as a task order to an umbrella contract known as "NETCENTS-1."  Pl.'s Br. filed Dec. 11, 2012, at 6, 9; Def.'s Br. filed Dec. 31, 2012, at 10.

NETCENTS-1 is a series of multiple-award indefinite-delivery, indefinite-quantity ("IDIQ") contracts, following the numbering convention FA8771-04-D-000X, through which the Air Force procures network-centric telecommunications equipment and services. Pl.'s Br. filed Dec. 11, 2012, at 7; Def.'s Br. filed Dec. 31, 2012, at 3.  The initial term of NETCENTS-1 ran from September 10, 2004, to September 9, 2007.  AR 534-35; Def.'s Br. filed Dec. 31, 2012, at 8.  Two option periods followed, from September 10, 2007, to September 9, 2008, and from September 10, 2008, to September 9, 2010.  AR 536, 541; Def.'s Br. filed Dec. 31, 2012, at 8.  After exercise of the two options, the ordering period under NETCENTS-1 was to expire on September 9, 2011, with performance to be completed by September 8, 2012.  AR 475; Def.'s Br. filed Dec. 31, 2012, at 8.  The Air Force extended those periods, so that the ordering period expired on September 9, 2012, and the performance period expired on September 8, 2014.  AR 472; Def.'s Br. filed Dec. 31, 2012, at 8.  It was during this first extension that the Air Force issued the Solicitation. Thereafter, the Air Force extended the ordering period under NETCENTS-1 to March 31, 2013, with an additional option to extend the ordering period to September 30, 2013, and extended the performance period to the date two years after expiration of the ordering period.  AR 507; Def.'s Br. filed Dec. 31, 2012, at 9-10.

The prior two Tinker BTS contracts awarded to plaintiff were the result of open-source solicitations and were not awarded as task orders to NETCENTS-1.  Pl.'s Br. filed Dec. 11, 2012, at 7; Def.'s Br. filed Dec. 31, 2012, at 13.  Because the Solicitation was issued under NETCENTS-1, it was advertised only through the NETCENTS-1 website beginning on June 8, 2012.  Pl.'s Br. filed Dec. 11, 2012, at 7; Def.'s Br. filed Dec. 31, 2012, at 13.  The Solicitation stated that the contract was a small business set-aside for NETCENTS-1 contract holders.  AR 71; Pl.'s Br. filed Dec. 11, 2012, at 7-8.

On June 27, 2012, another contractor, J.D. Broco, LLC ("J.D. Broco"), filed a North American Industry Classification System ("NAICS") code appeal with the United States Small Business Administration (the "SBA"), arguing that the Solicitation was improperly assigned NAICS Code 517110, for "Wired Telecommunications Carriers."  AR 926-28;

2

Pl.'s Suppl. App'x filed Jan. 7, 2013, at A3. 1/  That same code had been assigned to the NETCENTS-1 contracts.  Pl.'s Suppl. App'x filed Jan. 7, 2013, at A3.  J.D. Broco argued that NAICS Code 517110 was improper because its definition called for the operation and/or provision of access to transmission facilities and infrastructure owned or leased by the contractor, whereas the Tinker telecommunications systems were owned by the Air Force. Id. at A12.  J.D. Broco urged that the correct NAICS code was 811213, for "Communication Equipment Repair and Maintenance."  Id. at A3-4.  NAICS Code 811213 describes the repair and maintenance of communications equipment without the retail of new equipment. Id. at A12-13.  According to J.D. Broco, that description more accurately characterized the Tinker BTS services.  Id. at A12.  J.D. Broco also pointed to two SBA decisions finding that BTS services were not properly classified under NAICS Code 517110 and should have been classified under NAICS Code 811213.  Id. at A13-19.  J.D. Broco further argued that NETCENTS-1 encompassed a far broader range of services than those called for in the Solicitation.  Id. at A19.

Had NAICS Code 811213 been assigned, J.D. Broco alleged, the Air Force could not have maintained the procurement as a small business set-aside strictly for NETCENTS-1 contract holders, as there were not two NETCENTS-1 contract-holding small businesses meeting the size restrictions of NAICS Code 811213.  Id. at A4.  J.D. Broco urged that, in order to procure the Tinker BTS services through a small business set-aside, the Air Force was required to use a different contractual vehicle and that J.D. Broco would compete for any such procurement of Tinker BTS services.  Id.

Responding to J.D. Broco's appeal, the contracting officer argued that NAICS Code 811213 was improper, as it did not provide for operation of Tinker's telephone system switch and the sale of certain new equipment.  Id. at A156-57.  The contracting officer further asserted that J.D. Broco lacked standing to bring the appeal.  Id. at A158.  Pursuant to January 27, 2005 direction by the Secretary of the Air Force, she deemed NETCENTS-1 to be a mandatory procurement source for telecommunications services such as the Tinker BTS services, and J.D. Broco could not submit a proposal because it was not a NETCENTS-1 contract holder.  Id.  Because J.D. Broco could not submit a proposal, it was not an interested party with standing to challenge the Solicitation.  Id.

J.D. Broco responded that the contracting officer had not quantified the proportion of the contract made up by new equipment sales.  Id. at A168-69.  J.D. Broco had contacted the incumbent contractor, plaintiff, which represented that new equipment sales, including repair parts, made up only 21% of the previous contract.  Id. at A169.  In light of that low

---

1/  The court ordered plaintiff to file the record of J.D. Broco's SBA appeal as a supplemental appendix to plaintiff's brief filed January 7, 2013.  See Order entered Jan. 29, 2013.  Plaintiff did so on February 8, 2013.

percentage, coupled with NAICS Code 517110's contemplation that the contractor would own the system, J.D. Broco argued that NAICS Code 517110 was not the most appropriate code for the Solicitation and that NAICS Code 811213 was.  Id.

On the question of standing, J.D. Broco disputed the contracting officer's contention that the use of NETCENTS-1 to procure the Tinker BTS services was mandatory.  Id. at A162-63.  J.D. Broco pointed out that the January 27, 2005 memorandum cited by the contracting officer included language indicating that a waiver of the use of NETCENTS-1 could be obtained for an individual procurement.  Id. at A163.  J.D. Broco further asserted that the memorandum did not have the force of law and had not been reviewed in light of either the SBA's findings that NAICS Code 517110 was inappropriate for BTS services or a 2007 Department of Defense Inspector General report stating that NAICS Code 517110 was inappropriate for NETCENTS-1.  Id. at A163-67.  Moreover, J.D. Broco stated, the Air Force repeatedly had procured BTS services at various installations outside NETCENTS-1.  Id. at A167-68.  Accordingly, it was not mandatory for the Air Force to procure the Tinker BTS services through NETCENTS-1, and J.D. Broco had standing as a potential offeror if the proper NAICS code were used.  Id. at A168.

The SBA dismissed J.D. Broco's appeal for lack of standing on August 7, 2012, ruling that J.D. Broco could not show that it had been adversely affected by the classification of the BTS contract.  J.D. Broco, LLC, SBA No. NAICS-5389, 2012 WL 3527918 (Aug. 7, 2012); see Def.'s Br. filed Dec. 31, 2012, at 13.  The SBA found that, even if the contract were not solicited through NETCENTS-1, J.D. Broco could not show that the Air Force would have procured through an open small business set-aside solicitation.  J.D. Broco, 2012 WL 3527918; Def.'s Br. filed Dec. 31, 2012, at 13.  Thus, the SBA concluded that it was "largely speculative" that J.D. Broco was a potential offeror on the contract.  J.D. Broco, 2012 WL 3527918; see Def.'s Br. filed Dec. 31, 2012, at 13.

On June 28, 2012, one day after J.D. Broco filed its NAICS code appeal, plaintiff sent a letter to the office of United States Senator John Cornyn raising concerns that the Solicitation should not have been issued under NETCENTS-1 and that the procurement should have proceeded as a stand-alone, small business set-aside.  AR 924-25.  Senator Cornyn's office forwarded plaintiff's letter to the Air Force's Office of Legislative Liaison on July 17, 2012, and requested a response to plaintiff's concerns.  AR 922.

Proposals in response to the Solicitation initially were due on June 25, 2012.  AR 71.  On June 14, 2012, that date was extended to June 27, 2012.  AR 256.  On June 26, 2012, the Air Force again extended the deadline for proposals to July 9, 2012.  AR 258.  On June 27, 2012, the SBA ordered the Air Force to stay the Solicitation pending the outcome of J.D. Broco's NAICS code appeal.  Pl.'s Suppl. App'x filed Jan. 7, 2013, at A153.  On July 10, 2012, the Air Force removed the stay and extended the due date for proposals to July 16,

2012. AR 264. The Air Force awarded the Tinker BTS contract, issued as a task order under Contract No. FA8771-04-D-0009, to Telos Corporation ("Telos") on August 20, 2012. AR 929-43.

## PROCEDURAL HISTORY

Plaintiff filed its complaint on October 26, 2012. On November 1, 2012, the court entered a scheduling order adopting the parties' proposed schedule for briefing on cross-motions for judgment on the administrative record. The administrative record was filed on November 19, 2012, and was amended twice, on December 10, 2012, and on December 17, 2012.

On January 11, 2013, plaintiff filed a motion to amend its complaint, to which the court ordered defendant to respond by January 15, 2013. The parties completed briefing on their dispositive motions on January 14, 2013, and defendant responded to plaintiff's motion to amend its complaint on January 15, 2013. The court heard argument on all pending motions on January 17, 2013.

During oral argument, defendant raised a new jurisdictional issue that had not been briefed by the parties, and the court ordered supplemental briefing. The parties completed that briefing on February 5, 2013.

## DISCUSSION

I. Standards of review

1. Standard of review for bid protests

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, § 12 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests. See Res. Conservation Grp., L.L.C. v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("Domenico Garufi"). The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA"). See 28 U.S.C. § 1491(b)(4) (2006). The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006); see also PGBA, L.L.C. v. United States, 389 F.3d 1219, 1224-27 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary or capricious standard of APA to review procurement decisions); Domenico Garufi, 238 F.3d at 1332-33 (noting that standards

applied in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), and its progeny apply to bid protests).

Accordingly, as restated by the United States Court of Appeals for the Federal Circuit, "[a] bid protest proceeds in two steps." <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines if, under the arbitrary or capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law. <u>2/</u>  <u>Id.</u>; <u>see also</u> <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1351 (Fed. Cir. 2004); <u>Domenico Garufi</u>, 238 F.3d at 1333; <u>Statistica, Inc. v. Christopher</u>, 102 F.3d 1577, 1581 (Fed. Cir. 1996). Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." <u>Bannum</u>, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence. <u>Domenico Garufi</u>, 238 F.3d at 1333.

If the agency action is determined to have violated an applicable procurement regulation, the court proceeds to address whether the action was significantly prejudicial to the protester. <u>See</u> <u>Bannum</u>, 404 F.3d at 1351, 1353-54; <u>see also</u> <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ("When a challenge is brought on the second ground [of the <u>Bannum</u> test], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." (citation omitted) (internal quotation marks omitted)). Even if a plaintiff can show that a procurement violation occurred, "[t]he prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award." <u>Bannum</u>, 404 F.3d at 1354. When making this evaluation, the court must be mindful that "[p]rejudice is a question of fact." <u>Id.</u> at 1353 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057 (Fed. Cir. 2000)). "To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting <u>Statistica</u>, 102 F.3d at 1582); <u>see also</u> <u>CACI, Inc.-Fed. v. United States</u>, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (explaining that, in order to show prejudice, plaintiff need only show "'that it was within the zone of active consideration'" (quoting <u>Morgan Bus. Assocs. v. United States</u>, 619 F.2d 892, 896 (Ct. Cl. 1980))); <u>accord</u> <u>Alfa Laval Separation, Inc. v. United States</u>, 175 F.3d 1365, 1367 (Fed. Cir. 1999). It is important to note that a plaintiff need not establish strict but-for causation in order to meet its burden of demonstrating that the agency's procurement violation was prejudicial. <u>See</u> <u>Data Gen. Corp. v. Johnson</u>, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

_____

<u>2/</u>  This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. <u>See</u> <u>Domenico Garufi</u>, 238 F.3d at 1332-33.

2. Standard of review for judgment on the administrative record

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c). This rule provides a procedure that allows the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court." Bannum, 404 F.3d at 1356. Unlike the standard for ruling on a motion for summary judgment under RCFC 56(c), a genuine dispute of material fact does not preclude a judgment on the administrative record. Id. at 1355-56.

3. Standard of review for injunctive relief

Plaintiff seeks a permanent injunction enjoining further performance of the Tinker BTS services and requiring the Air Force to procure those services through a competitive procurement outside of NETCENTS-1. See Pl.'s Br. filed Dec. 11, 2012, at 39. The Federal Circuit has described injunctive relief as "extraordinary relief." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). Adoption of the APA substantive standard of review did not change the standard for granting injunctive relief. See PGBA, 389 F.3d at 1225-27 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief). In order to obtain an injunction, the Federal Circuit requires a protestor to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, 389 F.3d at 1228-29). Success on the merits previously has been held to be the most important factor for a court to consider when deciding whether to issue injunctive relief. See Blue & Gold Fleet, 492 F.3d at 1312.

## II. The Federal Acquisition Streamlining Act

During oral argument defendant raised an issue regarding the applicability and effect of the Federal Acquisition Streamlining Act, 10 U.S.C. § 2304c(e) (Supp. V 2011) ("FASA"). The court ordered supplemental briefing on the subject because "[t]he Court of Federal Claims has held that FASA's limitation on protests of task or delivery orders is jurisdictional[,]" Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. 362, 371 (2012) (collecting cases), and a court is obligated to satisfy itself of its own jurisdiction, see Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec., 490 F.3d 940, 943 (Fed. Cir. 2007) (citing Mitchell v. Maurer, 293 U.S. 237, 244 (1934)). 3/

---

3/ FASA provides separate statutory provisions for civilian and military contracts. See BayFirst Solutions, LLC v. United States, 104 Fed. Cl. 493, 502 n.6 (2012). In the

FASA limits the jurisdiction of this court to hear bid protests related to the issuance of task orders:

> (e) Protests.—
>> (1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—
>>> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
>>> (B) a protest of an order valued in excess of $10,000,000.

10 U.S.C. § 2304c(e). The estimated value of the Tinker BTS contract is $9,808,904.78. AR 15; see also Pl.'s Br. filed Dec. 11, 2012, at 9. Consequently, only the first exception in FASA—that applicable to protests relating to scope, period, or maximum value—is germane to plaintiff's complaint.

As stated in its complaint, plaintiff raises two challenges. First, plaintiff argues that the Tinker BTS services are not within the scope of NETCENTS-1 because that contract does not contemplate the operation and maintenance ("O&M") of legacy systems outside the context of a transition to network-centric technology. Compl. ¶¶ 17-25. Plaintiff's second challenge is that the Air Force's justification for extending NETCENTS-1 was improper. 4/ Id. ¶¶ 26-34. While plaintiff's first challenge remains unchanged, see Pl.'s Br.

---

3/ (Cont'd from page 7.)

supplemental briefing order, the court mistakenly referred to the statute applicable to civilian contracts. See Order entered Jan. 18, 2013. The relevant language of the two statutes is identical. Compare 10 U.S.C. § 2304c(e) (Supp. V 2011), with 41 U.S.C. § 4106(f) (Supp. V 2011).

4/ Defendant moved to dismiss plaintiff's second challenge for lack of standing because the complaint stated that plaintiff was challenging the second extension of NETCENTS-1, whereas the Solicitation was issued under the first extension. See Def.'s Br. filed Dec. 31, 2012, at 20-22. In response plaintiff moved to amend its complaint to make clear that it was challenging the first extension. See Pl.'s Mot. filed Jan. 11, 2013. Defendant opposed the motion on grounds of untimeliness and futility, arguing that, prior to filing its complaint, plaintiff had access to all necessary information to determine under which NETCENTS-1 extension the Solicitation was issued and that plaintiff lacked standing to challenge the NETCENTS-1 extension. See Def.'s Br. filed Jan. 15, 2013.

Although "[t]he court should freely give leave [to amend] when justice so requires[,]" RCFC 15(a)(2), "the existence of such factors as 'undue delay, bad faith or dilatory motive

filed Dec. 11, 2012, at 27-36, the second has been refined over the course of litigation.  In its motion for judgment on the administrative record, plaintiff rephrases its second challenge as urging: NETCENTS-1 was extended for the purpose of procuring follow-on services, so it was not authorized to serve as the procurement vehicle for the Tinker BTS services, because those services are not follow-on services to NETCENTS-1.  See id. at 22-27.  In ordering supplemental briefing on the impact of FASA, the court expressed its understanding of plaintiff's second challenge in similar terms.  See Order entered Jan. 18, 2013 (phrasing plaintiff's second challenge thereby: "NETCENTS-1, which was extended twice on a sole-source basis, was used improperly as the contractual vehicle to procure the Tinker BTS services because they are not the type of services that would have justified a sole-source extension under the Competition in Contracting Act, 10 U.S.C. § 2304(d)(1)(B) [(Supp. V 2011)]").

Defendant concedes that plaintiff's first challenge is within FASA's limitations and that the court therefore possesses jurisdiction to hear that challenge.  See Def.'s Br. filed Jan. 25, 2013, at 1-3.  However, defendant argues that, pursuant to FASA, the court lacks jurisdiction to hear plaintiff's second challenge because that challenge does not contend that the Solicitation increases the scope of NETCENTS-1.  See id. at 2.

Plaintiff's responsive supplemental brief further clarifies that plaintiff's second challenge is that the extension of NETCENTS-1 narrowed the scope of that contract because the extension was authorized only for limited purposes.  See Pl.'s Br. filed Feb. 1, 2013, at 2-4.  Plaintiff thus argues that the court may hear both of its challenges, as the court must

---

4/  (Cont'd from page 8.)

on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment' may justify the denial of a motion for leave to amend[,]" Mitsui Foods, Inc. v. United States, 867 F.2d 1401, 1403-04 (Fed. Cir. 1989) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  The court finds that leave to amend is warranted.  Plaintiff's citation to the incorrect extension of NETCENTS-1 in the complaint effectively amounts to a clerical error that has caused no prejudice to defendant.  Permitting plaintiff to amend its complaint does not alter the essence of its challenges to the Solicitation, nor does it change defendant's responses to those challenges.  Indeed, defendant has argued that plaintiff lacks standing to challenge not only the second NETCENTS-1 extension, but also the first extension.  See Def.'s Br. filed Jan. 14, 2013, at 6-7.  Moreover, as discussed in the body of this opinion, the court necessarily must look to the first NETCENTS-1 extension to determine whether the Solicitation increases the scope of NETCENTS-1.  Accordingly, the amendment is not futile.

look to the justification for the extension of NETCENTS-1 to determine that contract's scope in deciding whether the Solicitation increases the scope.  See id.

In its reply defendant takes the position that plaintiff did not address whether FASA prevents the court from hearing plaintiff's second challenge.  See Def.'s Br. filed Feb. 5, 2013, at 1.  Defendant therefore maintains that plaintiff impliedly conceded that the court should dismiss that challenge for lack of jurisdiction.  See id.

The court concludes that FASA does not deprive the court of jurisdiction with respect to either of plaintiff's challenges, as each argues that the Solicitation increases the scope of the procurement vehicle, NETCENTS-1.  Plaintiff's first argument is that the Solicitation exceeds the scope of NETCENTS-1 because the Solicitation is for operation and maintenance of legacy telecommunications systems and that NETCENTS-1 does not contemplate such services except in the context of a transition to network-centric technology.  As defendant concedes, that argument takes the position that the Solicitation increases the scope of NETCENTS-1, which is a permissible challenge under FASA.  Accordingly, the court possesses jurisdiction to hear plaintiff's first challenge.

Plaintiff's second challenge also asserts that the Solicitation increases the scope of NETCENTS-1.  The argument, as advanced in plaintiff's motion for judgment on the administrative record, is that the Air Force's stated reason for extending NETCENTS-1 on a sole-source basis was "that the supplies and services to be purchased during the extended contract were only available from the original NETCENTS[-]1 contractors without substantial duplication of cost or unacceptable delays because they were follow[-]on purchases to the development or the product of a major system or highly specialize[d] equipment."  Pl.'s Br. filed Jan. 7, 2013, at 5; see also Pl.'s Br. filed Dec. 11, 2012, at 23-25.  The Solicitation, plaintiff posits, does not seek services that are only available from NETCENTS-1 contractors or that are follow-on purchases to the network-centric technology procured through NETCENTS-1.  As a consequence it increases the scope of NETCENTS-1.  See Pl.'s Br. filed Feb. 1, 2013, at 2 (stating that the Solicitation increased scope of NETCENTS-1 "as that scope was later constrained by the Government's sole[-]source extension of the contract for an expressly limited purpose").  That is a challenge to a task order contract that this court possesses jurisdiction to hear pursuant to FASA.

III.  Blue & Gold Fleet

Defendant also has advanced the position that plaintiff has waived its ability to challenge the Solicitation under the principle outlined in Blue & Gold Fleet, 492 F.3d 1308.  The Federal Circuit held in Blue & Gold Fleet that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection

subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d at 1313. Defendant argues that plaintiff both knew of the Solicitation and had the opportunity to object to it, as evidenced by plaintiff's letter to Senator Cornyn on June 28, 2012, prior to the deadline for submission of proposals, thereby indicating that plaintiff was aware that the Air Force was procuring the Tinker BTS services through NETCENTS-1.  Def.'s Br. filed Dec. 31, 2012, at 18-19.  Accordingly, plaintiff waived its challenge to the Solicitation.  Id. at 19-20.

Plaintiff responds, first, that the protestor in Blue & Gold Fleet was an offeror on a solicitation and that the Federal Circuit has never extended Blue & Gold Fleet's waiver principle to protestors who did not and could not bid or propose on the challenged solicitation.  Pl.'s Br. filed Jan. 7, 2013, at 7.  Plaintiff further argues against the application of Blue & Gold Fleet because the Solicitation was not advertised publicly; unlike the protestor in Blue & Gold Fleet, therefore, potential protestors did not have the full access to information that NETCENTS-1 contract holders did.  Id. at 7-8.  Finally, plaintiff concedes that, although it became "informally aware" of the Solicitation on June 22, 2012, it took timely action to challenge the Solicitation.  Id. at 8-9.  Plaintiff states that it "teamed as a potential subcontractor" with J.D. Broco because plaintiff did not meet the size limitations of NAICS Code 811213, which J.D. Broco was advocating as the proper code in its SBA appeal.  Id. at 8.  Plaintiff characterizes its letter to Senator Cornyn as "the only other avenue it saw open to it[,]" and therefore evidence that it challenged the Solicitation. Id.  Based on this scenario, plaintiff summarizes, it challenged the Solicitation prior to the close of bidding.  Id. at 8-9.

Defendant rejoins that the rationale of Blue & Gold Fleet applies to the circumstances of this case and that the Federal Circuit did not restrict the holding of Blue & Gold Fleet to disappointed bidders or offerors, as the opinion refers to "a party."  Def.'s Br. filed Jan. 14, 2013, at 3-4 (quoting Blue & Gold Fleet, 492 F.3d at 1313).  Defendant suggests that the interests of national defense and expeditious resolution of bid protests cited in Blue & Gold Fleet as the justification for the waiver rule also are present in the case at bar.  Id. at 4. Defendant notes that plaintiff does not dispute that it could have challenged the Solicitation before the close of bidding.  Id.  Plaintiff was the incumbent contractor and concedes that it became aware of the Solicitation on June 22, 2012, thereby affording plaintiff ample knowledge and time to challenge the Solicitation.  Id.  That plaintiff had an opportunity to challenge the Solicitation is further demonstrated by its letter to Senator Cornyn, as well as by the fact that J.D. Broco was represented by plaintiff's counsel before the SBA.  Id. at 5. Defendant describes Blue & Gold Fleet's waiver rule as designed to prevent contractors from taking advantage of the Government and other bidders, as well as to prevent after-the-fact litigation, and argues that those considerations are in play and make the application of the waiver rule appropriate.  Id. at 5.

11

Plaintiff is correct that the Federal Circuit has never held that <u>Blue & Gold Fleet</u>'s waiver rule applies to a protestor who did not and could not bid on a solicitation; indeed, the protestor in <u>Blue & Gold Fleet</u> had made an offer on the solicitation at issue. <u>See</u> 492 F.3d at 1311. As defendant emphasizes, however, the plain language of the holding of <u>Blue & Gold Fleet</u> is that "a party" that does not raise an objection prior to the close of bidding waives its challenge. 5/ <u>See id.</u> at 1313. In at least one opinion discussing <u>Blue & Gold Fleet</u>, the Federal Circuit has spoken in more specific terms:

> In <u>Blue & Gold Fleet</u> the point made is straight-forward—if there is a patent, *i.e.*, clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit.

<u>DGR Assocs., Inc. v. United States</u>, 690 F.3d 1335, 1343 (Fed. Cir. 2012). The Federal Circuit thus has specified the application of <u>Blue & Gold Fleet</u> to a "bidder." Yet, <u>DGR Associates</u> discussed <u>Blue & Gold Fleet</u> only in the context of whether the Government's arguments in the Court of Federal Claims were substantially justified the purpose of attorneys' fees analysis under the Equal Access to Justice Act. <u>See</u> 690 F.3d at 1343-44. It is also perhaps worth noting that the protestor in <u>DGR Associates</u> was precluded from offering on the solicitation at issue, but the Court of Federal Claims found that the protestor had satisfied <u>Blue & Gold Fleet</u> without discussion of whether the waiver rule applied to non-offerors. <u>See</u> <u>DGR Assocs., Inc. v. United States</u>, 94 Fed. Cl. 189, 193, 202-04 (2010).

As it appears, the Federal Circuit has not had occasion to provide guidance regarding the applicability of <u>Blue & Gold Fleet</u> to contractors that are eligible to offer on a solicitation and do not do so, or that are precluded from offering by the terms of the solicitation itself. However, two opinions from the Court of Federal Claims discuss that subject in greater depth.

---

5/ The Federal Circuit recently ruled that <u>Blue & Gold Fleet</u>'s waiver rule applies to an offeror when a solicitation is amended after the close of bidding and the amendment contains a patent error. <u>See</u> <u>COMINT Sys., Corp. v. United States</u>, 700 F.3d 1377, 1381-83 (Fed. Cir. 2012). In that situation it is incumbent on the protestor to raise an objection to the amendment prior to contract award. <u>See id.</u> at 1382 ("To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract."). In the case at bar, the alleged patent error in the Solicitation was not the result of a post-proposal amendment. Nor did <u>COMINT</u>'s application of <u>Blue & Gold Fleet</u> to the peculiar circumstances of <u>COMIT</u>; rather, the Federal Circuit applied <u>Blue & Gold Fleet</u> to a situation that arose after the deadline for submission of proposals.

In Infrastructure Defense Technologies, LLC v. United States, 81 Fed. Cl. 375 (2008) ("IDT"), the Defense Logistics Agency ("DLA") issued a presolicitation notice covering a request for proposal ("RFP") for a sole-source IDIQ contract to deliver collapsible defense walls manufactured to design specifications matching those of collapsible defense walls that previously had been supplied by a company known as Hesco Bastion, Ltd. ("Hesco"). 81 Fed. Cl. at 377-81. The presolicitation notice also stated that DLA would evaluate technically acceptable proposals. Id. at 381. Shortly thereafter and apparently without reference to the presolicitation notice, representatives of the plaintiff, IDT, which manufactured a competing product with a different design, met with the Deputy Under Secretary of Defense to advocate for full competition for force protection barriers. Id. at 382. DLA later issued its sole-source RFP for Hesco's products. Id. Although one non-Hesco offeror also responded to the RFP, IDT did not submit a bid or proposal and did not file a bid protest during the proposal period. Id. at 382-83. Only Hesco's proposal was deemed to meet the solicitation requirements. Id. at 383-84. IDT later filed a bid protest after the conclusion of the proposal period. Id. at 384.

The Court of Federal Claims held that IDT lacked standing to bring its bid protest, but also discussed whether IDT had waived its ability to challenge the solicitation. Id. at 384-89. Drawing a contrast with Blue & Gold Fleet, the court expressly found that the waiver rule should apply even though IDT was not an offeror:

> The clear instruction of the Federal Circuit that objection to the terms of the solicitation must be protested prior to the close of the bidding process, applies with no less force here. The protestor in Blue & Gold had submitted a bid; nevertheless, its failure to file its protest during the bid period was found to be a waiver. Because IDT did not file a bid or proposal, the case of waiver is even stronger.

Id. at 389. Significantly, the presolicitation notice invited "'[i]nterested persons'" to submit proposals. Id. at 386 (quoting the presolicitation notice). Although the presolicitation notice cautioned that it was "not a request for competitive proposals[,]" it stated that proposals received "will be considered by the Government. . . . Information received will normally be considered solely for the purpose of determining whether to conduct a competitive procurement." Id. (quoting the presolicitation notice). In light of that language, the court noted that, had IDT submitted a proposal, it would have had the same effect as IDT's bid protest, i.e., put DLA on notice that a competitive procurement was warranted. Id. Because IDT had neither submitted a proposal nor filed a protest during the bidding period, "[t]he agency was not afforded an opportunity to respond to the argument" that IDT was raising in its post-award bid protest. Id.

The subject of a non-offering protestor arose again in <u>Shamrock Foods Co. v. United States</u>, 92 Fed. Cl. 339 (2010).  The protestor, Shamrock Foods Co. ("Shamrock"), was the incumbent contractor for food and beverage supply and delivery services to Fort Bliss, Texas.  92 Fed. Cl. at 340-41.  Shamrock's contract, as with those held by other contractors providing similar services to other military installations, included terms that Shamrock might be called upon to serve as a back-up prime vendor for a nearby installation if that installation's prime vendor were unable to deliver the required services.  <u>Id.</u> at 341-42.  Based upon unsatisfactory performance, the procuring agency, DLA, decided to invoke the back-up prime vendor process in order to remove Shamrock as the prime vendor for Fort Bliss and find another food service supplier for the installation.  <u>Id.</u> at 342.  By letter to the contracting officer, Shamrock stated its opposition to its removal from Fort Bliss.  <u>Id.</u>

After examining prime vendors in neighboring areas, DLA found four potential back-up vendors, including Shamrock's Phoenix-based operation.  <u>Id.</u>  DLA issued a solicitation to all four potential back-up vendors to submit bids for the Fort Bliss services; all but Shamrock did so.  <u>Id.</u>  The Fort Bliss services were awarded to another contractor, U.S. Foodservice, Inc. ("Foodservice").  <u>Id.</u>  After award of the contract, Shamrock filed a bid protest in the Court of Federal Claims.  <u>Id.</u> at 342-43.

As in <u>IDT</u>, the court found that Shamrock lacked standing to bring its bid protest.  <u>Id.</u> at 344-45.  The court also addressed the question of waiver, finding that Shamrock had waived its ability to challenge the solicitation under the waiver rule of <u>Blue & Gold Fleet</u>.  <u>Id.</u> at 345-46.  The court explicitly rejected Shamrock's argument that <u>Blue & Gold Fleet</u> did not apply because Shamrock had not made an offer:

> First, plaintiff suggests that the waiver rule has no application to a plaintiff who abstains from participating in a procurement and who files a protest after the award of a contract.  In other words, waiver, in plaintiff's view, only occurs if "the contractor submitted a bid then waited to see if it would win before filing a protest."  Unfortunately for plaintiff, there is no support for this limited view of the waiver rule in <u>Blue & Gold Fleet</u> or in cases interpreting the waiver rule.  The unsurprising reason that the rule announced in <u>Blue & Gold Fleet</u> has been applied primarily to protestors who have submitted bids in response to solicitations is that actual bidders are "interested parties" who have standing to bring post-award bid protests.  The waiver rule in <u>Blue & Gold Fleet</u> clearly states that a challenge to the terms of a solicitation is untimely and waived if filed after the bidding period.  Shamrock waived its right to object to [DLA's] award of the back-up prime vendor contract work at Fort Bliss.

Id. (internal citations omitted).  Further, the court rejected Shamrock's argument that Blue & Gold Fleet should not apply because Shamrock did not have full knowledge of the contract award to Foodservice:

> Shamrock has argued, and continues to argue, that [DLA] had no right to compete the Fort Bliss portion of Shamrock's contract, and that argument has been waived under the precedent of Blue & Gold Fleet.  All of plaintiff's bid protest arguments have thus far focused on the illegality of the contract mechanisms by which the contract work at Fort Bliss was awarded to Foodservice.  These mechanisms were readily discernable in the solicitation provided to Shamrock.  It is of no consequence that the minutiae of the contract award to Foodservice were not revealed in the solicitation.

Id. at 346.

The court then footnoted the following broad assertion:  "This court has noted that in the post-award bid protest context 'the case of waiver [under Blue & Gold Fleet precedent] is even stronger' for a non-bidder than a bidder."  Id. at 346 n.12 (quoting IDT, 81 Fed. Cl. at 389).  IDT tied this declaration to the particular facts of that case, detailed over five pages.  This footnoted language demonstrates the need to exercise discretion in applying Blue & Gold Fleet to factual circumstances not presented in that case.  In both IDT and Shamrock Foods, DLA invited the protestors to submit proposals.  Indeed, the presolicitation notice in IDT solicited comments on DLA's intention to compete with one source; DLA advised that the information received via a response or a proposal would be considered in determining whether to conduct a competitive procurement.  See IDT, 81 Fed. Cl. at 385-86.  In Shamrock Foods the protestor's own operation was invited to bid on the contract to provide food services for Fort Bliss.  See Shamrock Foods, 92 Fed. Cl. at 342.  These invitations readily set IDT and Shamrock Foods apart from this case and others that involve non-bidders or -offerors.

Blue & Gold Fleet's waiver rule is grounded in the statutory imperative that in bid protests "the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*."  Blue & Gold Fleet, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)).  To that end, the Federal Circuit held that a waiver rule was appropriate because it "prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation."  Id. at 1314.  IDT and Shamrock Foods suggest that, in particular factual circumstances, those concerns apply equally when the protestor did not submit a bid in response to a solicitation.  In both cases, crucially, the agency had given protestors full knowledge of the terms of the solicitation that would give rise to their challenges, just as it would have to a bidding or offering contractor.  In both cases the danger of prejudice to the Government was the same as if the protestors

had been disappointed offerors, *i.e.*, a protest would render moot the procurement efforts to date and potentially require expending more time and effort on a reprocurement. As the court pointed out in IDT, the waiver rule permits the Government an opportunity to address potential defects in a solicitation at an early stage in the procurement process, thereby avoiding wasted procurement efforts. Similarly, the dangers of prejudice to other bidders were also present, whether to the awardee whose contract award would be in jeopardy, or to the disappointed bidders, the details of whose submissions might be revealed prior to reprocurement.

The key factor that emerges in IDT and Shamrock Foods is that it was uncontroverted that the agency had given notice directly to the protestors in those cases, so that it was readily apparent that they had full knowledge of the terms of the solicitations at issue and sufficient time and opportunity to raise objections before the deadline for proposal submissions. It is axiomatic that if a contractor has no knowledge of the terms of a solicitation, it should not be charged with the duty to bring any patent errors in that solicitation to the attention of the agency prior to the close of bidding. See IDT, 81 Fed. Cl. at 389 (citing Knowledge Connections, Inc. v. United States, 79 Fed. Cl. 750, 759 (2007) (declining to find waiver where protestor had no notice of the defect alleged prior to the close of the bidding period)).

What dissuades this court from endorsing a reading of Blue & Gold Fleet that would apply its waiver rule to non-offering contractors that on their own had acquired timely knowledge of the terms of the solicitation in issue is the same policy undergirding Blue & Gold Fleet's waiver rule, *viz.* "the need for expeditious resolution of the action." See 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)). It will not serve that need if a protest filed by a non-offering contractor becomes ensnared in an ancillary inquiry targeted to determining what the contractor knew about the solicitation and when it knew it, or whether the contractor chose the most effective means to bring the matter to the agency's attention. The case at bar illustrates the potential pitfalls of construing Blue & Gold Fleet to apply to non-offering contractors.

Plaintiff, unlike the protestors in IDT and Shamrock Foods, was not invited to submit a proposal in response to the Solicitation. Rather, plaintiff was excluded from submitting a proposal by the Solicitation's terms, as the Solicitation was reserved to small businesses holding NETCENTS-1 contracts. In the case of a contractor that is invited to submit a proposal, the contractor fairly may be charged with knowledge of the terms of a solicitation. In the instant matter, by contrast, the Solicitation was not publicly advertised, and plaintiff was not invited to submit a proposal. Without any further facts, plaintiff should not be charged with knowledge of the terms of the Solicitation, nor should such knowledge be imputed to plaintiff.

As it happens, plaintiff's letter to Senator Cornyn, which is included in the administrative record, discloses that plaintiff had demonstrated sufficient knowledge of the terms of the Solicitation to permit plaintiff to refer to the Solicitation by number, to lodge a complaint about the NAICS code assigned to the Solicitation, and to protest that the Tinker BTS services were outside the scope of NETCENTS-1.  See AR 924.  That letter is dated June 28, 2012.  See id.  It was forwarded to the Air Force on July 17, 2012.  See id. at 922.  The Tinker BTS contract was awarded on August 20, 2012.  See id. at 929-43.  Thus, like the protestors in IDT and Shamrock Foods, it appears that plaintiff had acquired the requisite knowledge of the Solicitation's terms to bring its challenge to the Air Force's attention in a timely fashion.  Furthermore, at the time that plaintiff wrote to Senator Cornyn, action on the Solicitation had been stayed by the SBA, which resulted in a stay that extended the close of the proposal period by three weeks and another month beyond that time to contract award.

If Blue & Gold Fleet were to apply, the question to be resolved would be whether plaintiff objected to the terms of the Solicitation prior to the deadline for proposals, such that it did not waive its ability to raise the same objection in this suit.  Plaintiff has pointed to both its letter to Senator Cornyn and J.D. Broco's SBA appeal as evidence that it raised its objection prior to the close of bidding.  Although the letter to Senator Cornyn was forwarded to the Air Force's Office of Legislative Liaison, see AR 922, it cannot constitute raising an objection in a manner that permitted the Air Force to address a potential error in the Solicitation.  To hold otherwise would permit a contractor to discharge its obligation under Blue & Gold Fleet by seeking redress through its congressional representatives, without regard to whether such efforts afforded the procuring agency an adequate opportunity to address potential errors in a solicitation.  The corollary is also problematic; the contracting officer might have actual knowledge of an alleged patent error in a solicitation through a congressional office during the period of an automatic stay.  Why should Blue & Gold Fleet require such a factual inquiry when a non-offeror has contacted its legislative representative?

Plaintiff's citation to J.D. Broco's SBA appeal raises a more difficult question regarding to what extent an objection lodged by another contractor may be imputed to a protestor that has "teamed as a potential subcontractor" with the contractor bringing the challenge.  See Pl.'s Br. filed Jan. 7, 2013, at 8.  J.D. Broco's challenge to the Solicitation before the SBA was that the Air Force had applied the wrong NAICS code to the Solicitation and that, if the correct code had been applied, the result would be that the Air Force could not procure the Tinker BTS services through NETCENTS-1.  J.D. Broco did not raise an objection to the Solicitation on the basis that the Tinker BTS services were outside the scope of NETCENTS-1.  The holding of Blue & Gold Fleet is that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise *the same objection* subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d at 1313 (emphasis added).  The objections that the Tinker BTS services are outside the

scope of NETCENTS-1 technically were never raised until plaintiff filed its complaint, although the contracting officer acknowledged that she understood the NAICS objection to implicate the scope of the task order. 6/

In the case of a contractor, like plaintiff, that was excluded from submitting a proposal by a solicitation's terms and did not submit a proposal, the potential for time-consuming collateral inquiries is too great to ignore, as this case demonstrates. Incentivizing the Government to launch such inquiries as part of defending a protest does not serve "the need for expeditious resolution of the action," 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)), that provides the rationale for Blue & Gold Fleet's waiver rule. Accordingly, despite plaintiff's knowledge of the basis for its outside-the-scope objections prior to the close of the bidding period, plaintiff should not be required to satisfy the Blue & Gold Fleet waiver rule in order to address its objections that the Solicitation is outside the scope of NETCENTS-1, and the court rules that plaintiff has not waived its right to do so.

IV.  Whether the Solicitation increases the scope of NETCENTS-1

1.  Standard of review

The Competition in Contracting Act, 10 U.S.C. § 2304 (Supp. V 2011) ("CICA"), generally requires that the Government procure products and services through competitive procedures, except in a given circumstance. See 10 U.S.C. § 2304(a). The Federal Circuit has held that, in determining whether a modification to a contract exceeds the scope of the

---

6/  This case necessitated an ancillary inquiry to ascertain whether plaintiff's knowledge of the J.D. Broco SBA appeal afforded plaintiff its own opportunity to lodge a Blue & Gold Fleet challenge. The court reviewed the entire record of the SBA proceeding, which plaintiff submitted as a supplemental appendix. That record revealed that the contracting officer herself understood J.D. Broco to challenge the scope of the task order. See Pl.'s Suppl. App'x filed Jan. 7, 2013, at A157 ("The emphasis of this solicitation is not merely the maintenance of the BTS, but its constant operation. The solicitation is different from those considered earlier by the Office of Hearing and Appeals, in that it emphasizes the constant operation of the system, and requires the government to purchase parts and equipment from the contractor. The contractor receiving the award of this requirement will not merely maintain the BTS; but it will be operating the system and ensuring constant service."). This leads to a ridiculous result. The court undertook a review of a separate administrative record to confirm that a contracting officer manifested knowledge of the basis for plaintiff's subsequent protest by her response to another contractor's protest of the same procurement action. Whether this knowledge could be translated into on-point knowledge is problematic. The court's review gleaned the insight that this type of ancillary inquiry is not what the Federal Circuit could have contemplated by its ruling in Blue & Gold Fleet.

contract such that CICA would require a competitive procurement of the services sought by the modification, the court "examines whether the contract as modified materially departs from the scope of the original procurement." AT&T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1205 (Fed. Cir. 1993) (citation omitted).  "A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." Id. (citation omitted).

The Court of Federal Claims has noted that a similar standard applies to the question of whether a task order increases the scope of its underlying contract, thereby necessitating competitive procurement pursuant to CICA.  See Solute Consulting v. United States, 103 Fed. Cl. 783, 792-93 (2012).  The court should compare the services described in the task order with those described in the contract, looking to whether the task order includes services or products not contemplated by the underlying contract.  See id. (citing Phoenix Air Grp., Inc. v. United States, 46 Fed. Cl. 90, 105-06 (2000); Omega World Travel, Inc. v. United States, 82 Fed. Cl. 452, 464 (2008)).  This is a fact-specific inquiry, requiring analysis of the facts in light of the particular circumstances of each case.  See Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 427 (2009) (citations omitted) (discussing inquiry in context of a modification to a contract).

### 2.   Whether the Solicitation increases the scope of NETCENTS-1 because it is a procurement solely for operation and maintenance of legacy systems

#### 1)   The parties' arguments

Plaintiff's first challenge urges that NETCENTS-1 does not contemplate operation and maintenance of legacy systems outside the context of a transition at an installation to network-centric telecommunications technology.  Pl.'s Br. filed Dec. 11, 2012, at 28-31. Because the Solicitation calls for purely operation and maintenance of legacy systems, plaintiff argues, it is therefore outside the scope of NETCENTS-1.  Id.  Plaintiff compares the purpose and scope of NETCENTS-1 with that of the Solicitation to support its argument. Id. at 10-20.

Plaintiff draws the court's attention first to the purpose of NETCENTS-1 as stated in that contract's Performance Work Statement ("PWS"), which reads:

> The purpose of this contract is to provide Network-Centric Information Technology, Networking, Telephony and Security (NCITNTS), Voice, Video and Data Communications Commercial-off-the-Shelf (COTS) products, system solutions and systems hardware and software to satisfy the requirements for interoperability, compatibility, and resource sharing of both

Government Furnished Equipment (GFE) and Contractor Furnished Equipment (CFE), supporting the Global Information Grid (GIG) architecture.

Id. at 10 (quoting AR 274). In service of that purpose, the PWS states that NETCENTS-1 "provides for the acquisition of NCITNTS system solutions, systems management, operations and maintenance support, configuration management, centralized logistics and inventory management support, spares and/or supplies." Id. (quoting AR 275). Plaintiff argues that it is apparent from the NETCENTS-1 PWS that the scope of NETCENTS-1 is the replacement of old telecommunications systems with integrated, networked telecommunications systems, not "routine maintenance of legacy systems." Id. By contrast, plaintiff asserts, the stated purpose for the Solicitation is the provision of "routine Operations and Maintenance services," quoting the following language in the Solicitation:

> Work under this Performance Work Statement (PWS) shall support the mission of 72 ABW Communications Directorate (SC) at Tinker Air Force Base (TAFB), OK with highly reliable telecommunications and networked voice, video and data services. The Contractor shall perform monthly Operations and Maintenance (O&M) services, work orders, and other services for the Base Telecommunications System (BTS) and be available 24 hours per day, 7 days per week.

See id. at 11 (quoting AR 141). 7/

Next, plaintiff points to the list of services to be provided in the NETCENTS-1 PWS, which calls for the provision of services "through a logical process of phased actions" proceeding, as follows: "Requirements analysis and conceptual design, [s]ite survey, [s]ystem design review, [c]ritical design review, [i]nstallation, [i]ntegration training and testing, [and] [l]ife cycle support." Id. at 10-11 (quoting AR 287). Plaintiff draws a distinction between those services and the services listed in the "Services Summary" section of the Solicitation, which plaintiff characterizes as not being "the sort of high[-]level design and supply of integrated network solutions that is clearly contemplated in [NETCENTS-1]." Id. at 11-16 (citing AR 170-73). Plaintiff further argues that while "life cycle support" is a maintenance service, the Solicitation's PWS contemplates "life-cycle support to NCITNTS systems[,]" not legacy systems. Id. at 16 (quoting AR 300).

Plaintiff also cites differences in the labor required under NETCENTS-1 and the Solicitation. Id. at 18-19. NETCENTS-1 lists a broad array of workforce types, broken into

___

7/ Plaintiff's brief states that it is quoting AR 9, but the quoted language differs in minor respects from that on AR 9 and appears verbatim on AR 141. Compare AR 9 with AR 141.

two categories, thereby suggesting that NETCENTS-1 is an implementation contract, not an O&M contract.  Id. at 18-19; see also AR 383.  By contrast, plaintiff argues, the Solicitation lists specific job descriptions targeted to the provision of maintenance services, and includes a site manager in its list of required labor, which NETCENTS-1 does not.  Id. at 19 (citing AR 137, 163).

Finally, plaintiff argues that the Solicitation makes clear that the legacy systems at Tinker are not being replaced with network-centric technology.  Id. at 30.  Plaintiff urges that the Solicitation contains no language calling for the provision of new systems, which is the purpose of NETCENTS-1.  Id. at 30-31.  Plaintiff also cites the Solicitation's market research document, which states that the "antiquated" Lucent 5ESS switch at the center of Tinker's telecommunications system is not scheduled for decommissioning until fiscal year 2017.  Id. at 8 (citing AR 9).

Defendant disputes plaintiff's characterization of NETCENTS-1, stating that it "includes every conceivable telecommunications service."  Def.'s Br. filed Dec. 31, 2012, at 24.  Defendant emphasizes the enterprise-wide nature of NETCENTS-1, asserting that it is intended to be "a total network solution."  Id. at 25 (citing AR 706).  To accomplish that purpose, NETCENTS-1 encompasses not only the purchase and installation of new technology, but also the operation and maintenance of legacy systems, singling out NETCENTS-1's requirement of "sustainment of dissimilar manufacturer's switching systems . . . and legacy systems."  Id. (quoting AR 712).  Defendant further cites the requirement that the contractor "relocate, or replace, perform preventive and unscheduled maintenance, system-level troubleshooting, [and] provide parts/spares repair . . . as directed by the Task Order."  Id. (quoting AR 712).  Defendant also highlights language in NETCENTS-1 regarding maintenance of the Air Force's Voice Switching Systems, including Tinker's Lucent 5ESS switch:

> The support for Air Force's Voice Switching Systems (see attachment 14 for current fleet of switches) will encompass new installation, upgrade, replacement, maintenance (routine, preventive, unscheduled, emergency) . . . , relocation and reutilization and post cutover support of telephone switches, . . . records management, . . . [and] voice/data/imagery/sensory and video switching functions[.]

See id. at 4-5 (quoting AR 710).

According to defendant, NETCENTS-1 "repeatedly" refers to current telecommunications technologies.  Id. at 25.  Section 3.3.9 of the Solicitation, entitled "Maintenance," states:  "The specific maintenance requirements will be specified in the Task/Delivery Order and may include maintenance on systems/equipment not purchased

under this contract." See id. at 26 (quoting AR 724).  Section 3.3.10, entitled "NCITNTS Operations," provides: "The Contractor shall provide NCITNTS operations support for both systems installed under this contract and systems currently fielded by the Government." See id. (quoting AR 724).  Defendant also directs the court's attention to the sample problems included in the Solicitation, which required the contractor to describe its strategy "for sustainment activities including active management, reliable operation and rapid restoration of Air Force Voice Switching Systems[,]" and specifically listed Lucent switches, like that in place at Tinker, as part of the "Current Telephony Switch Fleet to be Maintained[.]" See id. (citing AR 795-97); AR 795-97.

It is defendant's position that the Solicitation is not limited to the maintenance of existing systems.  The same language from the Solicitation, quoted by plaintiff, states that the contractor will provide "networked voice, video, and data services." See Def.'s Br. filed Dec. 31, 2012, at 27 (quoting AR 141).  Defendant notes the similarity of that language to the purpose language in NETCENTS-1, stating that "this contract is to provide Network-Centric Information Technology, Networking, Telephony and Security (NCITNTS), Voice, Video and Data Communications." See id. (quoting AR 706).  Defendant also cites language in the Solicitation providing for system upgrades:

> Support requirements may originate from technology changes, hardware and software systems upgrades, reconfigurations, new or additional equipment, local area networked cable installations and upgrades, and Dial Central Office (DCO) reconfigurations.  This includes routing/diversity requirements and any other environmental changes that could impact or alter the base BTS requirements.

See id. at 28 (quoting AR 142).  That the Solicitation calls for system upgrades also is reflected in the Solicitation's market research document, which discusses a transition to Voice Over Internet Protocol ("VOIP") technology:

> Changes in the market place have resulted in moving forward to Voice Over Internet Protocol (VOIP) vs. analog/copper requirements for phones.  This eliminates the need to continue to maintain/upgrade the antiquated 5ESS Lucent Switch scheduled for decommissioning in FY17.

AR 9; see Def.'s Br. filed Dec. 31, 2012, at 11 (citing AR 9), 29 (stating that Solicitation "also includes the operation and maintenance of [Tinker's] newly-acquired voice over internet phone system").

Plaintiff rejoins that defendant has taken provisions of NETCENTS-1 out of context and that a fuller reading of those provisions supports plaintiff's view.  Pl.'s Br. filed Jan. 7,

2013, at 11.   The NETCENTS-1 language discussing "sustainment of dissimilar manufacturer's switching systems . . . and legacy systems" appears in a section entitled "Integration" that requires technologies procured under the contract to be interoperable.  See id. at 12 (citing AR 711).  Plaintiff argues that the only maintenance described in that section is that which is incidental to the installation of network-centric telecommunications technology.  Id.  With respect to the NETCENTS-1 provision discussing support for the Air Force's voice switching systems, plaintiff notes that that language appears in a section entitled "Objective," which describes the objective of NETCENTS-1 as the migration to network-centric technologies and the support of integration efforts.  Id. at 13 (citing AR 708).  Again, plaintiff argues that NETCENTS-1 calls for the support of voice switching systems, like Tinker's Lucent 5ESS switch, only in the context of migrating to network-centric technologies.  Id. at 13-14.  Plaintiff therefore posits that a reasonable contractor would not have foreseen the procurement of stand-alone legacy systems maintenance under NETCENTS-1.  Id. at 14-15.

With respect to Section 3.3.10 of NETCENTS-1, plaintiff notes that section bears the heading, "NCITNTS Operations," and calls for the provision of "NCITNTS operations support."  See id. at 16-17 (quoting AR 728).  While network-centric technology is being installed, it is logical that there will be a period where new technology and legacy systems must operate side-by-side and be interoperable, so that this section contemplates maintenance of legacy systems in that context.  Id. at 17.  The Solicitation seeks to procure only maintenance of legacy systems, plaintiff argues, not maintenance as new technology is installed.  Id.

Defendant's final riposte is that, while interoperability during the installation of new technology is one of the goals of NETCENTS-1, maintenance of legacy systems, too, is a stated goal of that contract.  Def.'s Br. filed Jan. 14, 2013, at 9.  Defendant notes Attachment 14 of NETCENTS-1, which lists the "Current Telephony Switch Fleet to be Maintained" and includes a line item for 7 Lucent switches, the same make as the Lucent 5ESS switch at Tinker.  See id. at 9 (citing AR 797).

2)   The scope of NETCENTS-1 with respect to O&M services

As an initial matter, the court concludes that NETCENTS-1 contemplates the operation and maintenance of legacy systems in the context of a transition to new, network-centric technologies, as is established by an examination of the NETCENTS-1 PWS.  Per the PWS, the purpose of NETCENTS-1

is to provide Network-Centric Information Technology, Networking, Telephony and Security (NCITNTS), Voice, Video and Data Communications Commercial off-the-Shelf (COTS) products, system solutions and system

hardware and software to satisfy the requirements of interoperability, compatibility, and resource sharing of both Government Furnished Equipment (GFE) and Contractor Furnished Equipment (CFE), supporting the Global Information Grid (GIG) architecture. This contract, Network-Centric Solutions (NETCENTS), is designed as a flexible end-user solution to embrace diverse current and future network-centric information technology requirements, ensure interoperability through standards-based technology (using both GFE and CFE) and implement the constant evolution of state-of-the-art technology and system solutions, supporting initiatives and programs such as, but not limited to, the Defense Information System Network (DISN), Defense Switch Network (DSN), Defense Message System (DMS), Air Force System Network (AFSN), Secret Internet Protocol Router Network - (SIPRNET), Non-Classified Internet Protocol Router Network - (NIPRNET)), Defense Research & Engineering Network (DREN), Global Command and Control System (GCCS), Global Combat Support System (GCSS), Combat Information Transport Systems (CITS) and the Air Force's Voice Switching Systems (VSS).

AR 274, 371. Thus, the broadly-stated purpose of NETCENTS-1 is to effect an enterprise-wide transition to network-centric information technology. While that project includes support of the Air Force's Voice Switching Systems, like the legacy system in place at Tinker, the purpose statement of the PWS expressly conveys that such support is contemplated as part of the overall implementation of new technologies. That understanding is reinforced by the manner in which the PWS addresses operation and maintenance of legacy systems in other provisions.

Section 1.2.2 of the PWS, entitled "Objective," states that NETCENTS-1 "will provide support to all Government assets regardless of purchase contract." Id. at 276-77, 373-74. That section goes on to discuss the Air Force's Voice Switching Systems specifically:

The support for Air Force's Voice Switching Systems (see attachment 14 for current fleet of switches) will encompass new installation, upgrade, replacement, maintenance (routine, preventive, unscheduled, emergency) and sustainment, administrative, engineering, technical assistance, configuration management, relocation and reutilization and post cutover support of telephone switches, directory services, records management, trouble ticketing, billing, security, multi-tasking, centralized/decentralized or distributed processing architectures, voice/data/imagery/sensory and video switching functions, and serve subscribers in defined zones or communities of interest.

Id. at 278, 375.  While that language suggests that NETCENTS-1 requires support of legacy systems, the Objective section begins:

> The objective of this contract is to provide global technical integrated solutions under multiple awards, Indefinite-Delivery/Indefinite-Quantity (ID/IQ) Task/Delivery Order type contracts that support the integration efforts of the Air Force and the DoD.  This contract actively supports the migration of network-centric systems and common standard data into an integrated and interoperable GIG that supports the Department's Joint Vision 2020 concept.

Id. at 276-77, 373-74.  Again, then, the PWS discusses support of previously purchased legacy equipment in the context of the overall shift to network-centric technologies.

The most detailed discussion of maintenance of legacy systems in the NETCENTS-1 PWS appears in Section 3.1.1., "Integration," which opens with the statement:

> The Contractor shall act as an integrator and facilitator to ensure that the purpose of this contract is met.  All equipment and solutions provided under this contract shall be interoperable and part of an integrated solution meeting Joint Interoperability requirements, Joint Interoperability Testing Center (JITC) requirements, Defense Switched Network Interoperability requirements, CITS [Combat Information Transport System] interface requirements, VSS System Interface Specification requirements and any other standards document identified within the PWS or Task Order.

Id. at 279, 376.  After several paragraphs relating to design and implementation of network-centric technologies, the section discusses maintenance of legacy systems:

> The Contractor shall provide global support, help desk support, planning and sustainment of dissimilar manufacturer's switching systems, applications, support and peripheral equipment related to Voice Switching Systems and legacy systems.  The Contractor shall maintain and support hardware and software applicable to the VSS to interface with, both Government provided and leased facilities.  The Contractor shall provide services to engineer, integrate, install, upgrade, restore, relocate or replace, perform preventive and unscheduled maintenance, system-level troubleshooting, provide parts/spares repair and return capabilities, manage and secure Air Force Systems and VSS hardware/software and associated support equipment and facilities as directed by the Task Order.

Id. at 280, 377. This section explicitly contemplates maintenance and support of legacy systems, but does so under the heading "Integration," follows several paragraphs relating to the transition to new technologies, and notes in the same paragraph the need to "interface." The thrust of the quoted language is that the contractor will be required to maintain legacy systems to ensure their integration and ability to interface with new technologies as they are installed.

Notably, no express discussion of operation and maintenance of legacy systems is included in the PWS sections headed "Maintenance," "NCITNTS Operations," or "Life-Cycle Support." See id. at 292-93, 296, 300, 389-90, 393, 397. Section 3.3.9, "Maintenance," states: "The Contractor shall provide a worldwide maintenance solution capability (on-site and on-site per-call) for NCITNTS systems with qualified maintenance personnel, and leverage existing OEM [original equipment manufacturers] support infrastructures to the greatest extent possible." Id. at 292, 389. While the section does state that the maintenance requirements "may include maintenance on systems/equipment not purchased under this contract[,]" id., that statement is made in the context of the requirement that the contractor provide maintenance "for NCITNTS" solutions, see id. Read together, the statements indicate that the contractor may be required to provide maintenance of network-centric technologies purchased under a separate contract. That would not encompass legacy systems. The remainder of the "Maintenance" section contains no other language that might refer to legacy systems. See id. at 292-96, 389-393.

No reference in the NETCENTS-1 PWS is made to operation of legacy systems. The only discussion of operation is found in Section 3.3.10, "NCITNTS Operations," which requires the contractor to "provide NCITNTS operations support for both systems installed under this contract and systems currently fielded by the Government." Id. at 296, 393. Similarly to the "Maintenance" section, while this section discusses systems not purchased under NETCENTS-1, it contemplates the provision of "NCITNTS operations support." It thus requires the contractor to provide operations support to network-centric systems not purchased under NETCENTS-1, not legacy systems.

Finally, Section 3.6., "Life-Cycle Support," requires the contractor to "provide for the duration of the contract and warranty periods life-cycle support to NCITNTS systems[.]" Id. at 300, 397. The section states that such support "includ[es] . . . maintenance support (routine, preventative, unscheduled, emergency) . . . for all DoD owned and/or managed equipment/system assets." Id. The phrase "all DoD owned and/or managed equipment/system assets" might be read to include legacy systems, but it appears in the context of a provision requiring life-cycle support for network-centric systems, thereby indicating that it is meant to refer to all DoD owned and/or managed network-centric equipment/system assets.

Thus, the court concludes that, to the extent that NETCENTS-1 contemplates the operation and maintenance of legacy telecommunications systems, it does so in the context of the enterprise-wide transition to network-centric technology that NETCENTS-1 is to effect.

### 3)  The scope of the Solicitation

The court concludes that the Solicitation does not seek to procure only operation and maintenance of legacy systems, as the record demonstrates that a transition to network-centric technologies, namely VOIP, at Tinker is underway.   As the Coordination and Approval document for the first extension of NETCENTS-1 notes, VOIP is one of the network-centric technologies to be implemented under NETCENTS-1:

> The Air Force has also used the NETCENTS contracting vehicle to upgrade its fielded telecommunications switches, incorporating unified, standardized capabilities such as "Voice over IP" to provide secure, swift, and reliable voice communication within the existing telephone system, and more importantly, to support *future* network-based voice capabilities following the same standards.

AR 478.

The market research document for the Tinker BTS services discusses the transition to VOIP technology at Tinker:

> Changes in the market place have resulted in moving forward to Voice Over Internet Protocol (VOIP) vs. analog/copper requirements for phones.  This eliminates the need to continue to maintain/upgrade the antiquated 5ESS Lucent Switch scheduled for decommissioning in FY17.

Id. at 9.  The document continues to state that the Air Force is "presently implementing" VOIP at Tinker, and that it "has invested in VOIP technology and is presently planning/implementing transitioning from analog to VOIP base wide."   Id. at 12.  The acquisition plan for Tinker BTS services also notes the need for the contractor to provide maintenance of "Telephone, (Analog & VOIP)[.]"  Id. at 24.

That the Solicitation calls for operation and maintenance of legacy systems, as well as the implementation and maintenance of VOIP technology, is reflected in the Solicitation itself.   The Solicitation's PWS indicates at the outset that it calls for services beyond operation and maintenance of legacy systems in the scope of work section and the section discussing base mission requirements.  The PWS's scope of work states that the contract will

provide "highly reliable telecommunications and networked voice, video and data services." Id. at 141.  More specifically, the PWS requires the contractor to "install Government Provided Equipment (GFE) when authorized to include Fiber cabinets and wall racks." Id.

The Solicitation requires the contractor to "furnish COTS products needed to develop, install, design, maintain and/or upgrade Base Telecommunications Services at Tinker[.]" Id. at 74.  The COTS products referenced are listed in contract line item number X003, which consists of 525 items including telephones, handsets, panels, cable, and conduit.  See id. at 74, 114-32.  Several of those items reflect the installation of fiber optic cable, consistent with the market research document's discussion of the transition away from analog technology.  See id. at 9, 117-21, 123-25, 127, 130.  The Solicitation therefore contemplates the implementation of network-centric technology.

The Solicitation also calls for maintenance of the legacy telecommunications systems at Tinker.  The Solicitation's PWS requires the contractor to "provide all personnel, equipment, parts, material, tools, labor, vehicles, and any other items and services necessary to perform O&M of the BTS."  AR 145.  The contractor is to "perform O&M of the telephone switching system(s) and its associated power plant, transmission equipment, ancillary equipment, Customer Premise Equipment (CPE).  O&M support and services include both the inside and outside cable plant for telephone and network infrastructure." Id.  The PWS specifically requires that the contractor perform backups of the Lucent 5ESS switch.  Id. at 146.  Thus, the Solicitation contemplates the maintenance of Tinker's legacy system alongside the implementation of VOIP technology.

### 4)   Whether the Solicitation increases the scope of NETCENTS-1

NETCENTS-1 encompasses within its scope the operation and maintenance of legacy telecommunications systems in the context of a transition to the network-centric technologies NETCENTS-1 was put in place to procure.  The Solicitation contemplates just such operation and maintenance services, as it requires the operation and maintenance of Tinker's analog telephony systems while the installation transitions to VOIP technology. Thus, the court finds and concludes that the Solicitation is within the scope of NETCENTS-1, and CICA does not require an open procurement of the Tinker BTS services.

### 3.   Whether the Solicitation increases the scope of NETCENTS-1 as constrained by the first extension

Plaintiff's second challenge is that NETCENTS-1 was extended to allow for follow-on services to those services provided during the original term of NETCENTS-1.  See Pl.'s Br. filed Dec. 11, 2012, at 23-24; Pl.'s Br. filed Jan. 7, 2013, at 4-5.  Plaintiff asserts that the Solicitation does not represent NETCENTS-1 follow-on services because no equipment has

been procured through NETCENTS-1 at Tinker and no NETCENTS-1 contract holder has provided BTS services at Tinker. See Pl.'s Br. filed Dec. 11, 2012, at 24; Pl.'s Br. filed Jan. 7, 2013, at 5.

Plaintiff misconceives the nature of follow-on services under NETCENTS-1. NETCENTS-1 was designed to provide an enterprise-wide telecommunications solution. See AR 373-74 ("The objective of this contract is to provide global technical integrated solutions . . . that support the integration efforts of the Air Force and the DoD."). Such an undertaking necessarily occurs in a piecemeal fashion, with the implementation of new technology at certain installations before others. To determine whether services follow on to the original contract, then, the appropriate scope of review is the entire enterprise, not individual installations. Under plaintiff's view, if the Air Force had not begun the transition to network-centric technologies at an installation during the initial or option terms of NETCENTS-1, it could not then begin such a transition during any extension period. That is at odds with the enterprise-wide nature of the NETCENTS-1 project. For the reasons discussed above, the services described in the Solicitation are within the scope of NETCENTS-1, and they therefore constitute follow-on services to the original NETCENTS-1 contract. This argument against the scope of the Solicitation, issued as a task order to the NETCENTS-1 contract, does not prevail.

## V.  Injunctive relief

Turning to an examination of the factors to be weighed in determining whether to grant injunctive relief, the court finds that plaintiff is not entitled to an injunction prohibiting the Air Force from proceeding with Telos as its contractor. First, as discussed above, plaintiff has not succeeded on the merits. Second, plaintiff established that it has suffered irreparable harm because it lost the opportunity to compete on a contract for which, as the incumbent, it would have been expected to submit a proposal. This court has held that loss of an opportunity to compete constitutes irreparable harm. See Def. Tech., Inc. v. United States, 99 Fed. Cl. 103, 131 (2011) (citing DGR Assocs., Inc. v. United States, 94 Fed. Cl. 189, 210-11 (2010); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010)); see generally Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983).

Third, plaintiff has not shown that the balance of hardships tips in its favor. Plaintiff waited over two months after the contract at issue was awarded before filing its bid protest, during which time the transition of the Tinker BTS services to Telos had occurred and the first option period under the new BTS contract had commenced. Such a delay negatively impacts plaintiff's side of the scale. See Elmendorf Support Servs. Joint Venture v. United States, 105 Fed. Cl. 203, 210 (2012) ("Equity aids the vigilant, not those who slumber on their rights." (citations omitted)); Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 n.5 (2004) ("Of course, in some cases, serious delay in raising a claim may impact the

equities in determining whether an injunction should issue or lead to the imposition of laches."); Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 535 (2003) ("[D]elay in bringing a protest undoubtedly may be considered in the multi-factored analysis of whether injunctive relief is warranted[.]"); see also Blue & Gold Fleet, 492 F.3d at 1315-16 (citing Wit Assocs. and Software Testing Solutions).  Although plaintiff asserts that the transition to Telos "was accomplished speedily and without delay," and consequently that "there is no reason why a transition in the reverse should be any more difficult," Pl.'s Br. filed Jan. 7, 2013, at 22, that statement both is unsupported by any sworn declaration and fails to take into account the implementation of VOIP technology at Tinker.  When weighing the costs of terminating the Telos contract, particularly in light of the transition that had already occurred by the time plaintiff filed its complaint, the balance of hardships does not favor plaintiff.

Finally, the public interest would not be served by granting injunctive relief.  Plaintiff argues that injunctive relief is necessary to serve the public interest in maintaining the integrity of the government procurement process.  See Pl.'s Br. filed Jan. 7, 2013, at 22-23.  Because this procurement proceeded properly as a task order issued under an ID/IQ contract, injunctive relief would not achieve this end.

## CONCLUSION

Accordingly, based on the foregoing, plaintiff's motion to amend its complaint is granted, defendant's cross-motion for judgment on the administrative record is granted, and plaintiff's motion for judgment on the administrative record is denied. 8/  The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED**.

No costs.

/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge

---

8/  It is unnecessary to rule on defendant's motion to dismiss pursuant to RCFC 12(b)(1) any claim that plaintiff has challenged the NETCENTS-1 extension itself.  Although defendant's interpretation of plaintiff's complaint is understandable, plaintiff's challenges were directed to the scope of NETCENTS-1 and the task order.